IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AURORA COOPERATIVE ELEVATOR COMPANY,<br><br>           Plaintiff,<br><br>vs.<br><br>AVENTINE RENEWABLE ENERGY-AURORA WEST, LLC, and AVENTINE RENEWABLE ENERGY HOLDINGS, INC.,<br><br>           Defendants. | 4:12CV230<br><br>MEMORANDUM AND ORDER |
| AVENTINE RENEWABLE ENERGY HOLDINGS, INC.,<br><br>           Plaintiff,<br><br>vs.<br><br>AURORA COOPERATIVE ELEVATOR COMPANY,<br><br>           Defendant. | 8:12CV386<br><br>MEMORANDUM AND ORDER |

      This matter is before the Court on several motions in two related cases. In the first-filed suit (case no. 8:12cv386), Aventine Renewable Energy Holdings ("Aventine Holdings") seeks declaratory relief. *See* case no. 8:12cv386, filing 1. That case was originally filed in Texas state court and then removed to the United States District Court for the Northern District of Texas. On October 31, 2012, the case was transferred to this Court on Aurora Cooperative's motion. *See* case no. 8:12cv386, filing 27. Shortly after Aventine Holdings filed suit in Texas, Aurora Co-op brought suit in Nebraska state court, which was subsequently removed to this Court. *See* case no. 4:12cv230, filing 1. These cases raise common issues of fact and law relating to the construction of an ethanol plant near Aurora, Nebraska.

Aventine Holdings has filed a motion for summary judgment in its action for declaratory relief. Case no. 8:12cv386, filing 9. Aurora Co-op has responded to that motion and filed a motion to dismiss, arguing that the Court should exercise its discretion under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), to dismiss the declaratory action. Filing 54. Also before the Court is Aurora Co-op's motion to supplement the record. Filing 56. The Court has considered the parties' pleadings, briefs, and the record. As explained below, Aurora Co-op's motion to dismiss will be granted, Aventine Holding's motion for summary judgment will be denied as moot, and the Co-op's motion to supplement the record will be denied as moot.

In the case filed by Aurora Co-op (no. 4:12cv230), defendants Aventine Holdings and Aventine Renewable Energy-Aurora West, LLC ("Aventine West" and, collectively, "Aventine") have filed a motion to dismiss for failure to state a claim. Filing 25. Both sides have asked the Court to consider evidence beyond the pleadings and attached exhibits, and to convert the motion to one for summary judgment. *See* Fed. R. Civ. P. 12(d). Aurora Co-op has also filed a motion to supplement the record in this case. Filing 34. The Court finds that the motion to dismiss should be considered both under Fed. R. Civ. P. 12(b)(6), and as a motion for summary judgment under Rule 56; and that it should be denied under both standards. Finally, Aurora Co-op's motion to supplement the record will be granted.

## STANDARD OF REVIEW
### I. Rule 12(b)(6)

A complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). The plaintiff must plead factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Hamilton v. Palm*, 621 F.3d 816, 817 (8th Cir. 2010). The complaint need not contain detailed factual allegations, but must provide more than labels and conclusions; and a formulaic recitation of the elements of a cause of action will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The Court must assume the truth of the plaintiff's factual allegations, and a well-pleaded complaint may proceed, even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely. *Id.* at 555–57. In contrast to factual allegations, courts are not required to accept as true a plaintiff's legal conclusions. *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459 (8th Cir. 2010).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, that if accepted as true, states a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The facts alleged must raise a reasonable expectation that discovery will reveal evidence to substantiate the necessary elements of the plaintiff's claim. *Twombly*, 550 U.S. at 556.

When considering a motion to dismiss under Rule 12(b)(6), the Court is normally limited to considering the facts alleged in the complaint. If the Court considers matters outside the pleadings, the motion to dismiss must be converted to one for summary judgment. Fed. R. Civ. P. 12(d). However, the Court may consider exhibits attached to the complaint and materials that are necessarily embraced by the pleadings without converting the motion. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003). Documents necessarily embraced by the pleadings include those whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading. *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012). The Court may also take notice of public records. *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007).

The parties have both requested the Court to consider additional evidence and convert the motion to dismiss to one for summary judgment. *See* Fed. R. Civ. P. 12(d). The Court has considered the additional evidence and will convert the motion. However, Aventine maintains that, even if its motion is denied under the summary judgment standard, Aurora Co-op's complaint fails to state a claim for relief. So, after considering Aventine's motion under the summary judgment standard, the Court will consider it under Rules 8 and 12(b)(6).

## II. Rule 56

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to

show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County,* 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC,* 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson,* 643 F.3d at 1042.

An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). The Court must rely upon evidence that will be admissible at trial to determine the presence or absence of a material issue of fact. *Firemen's Fund Ins. Co. v. Thien,* 8 F.3d 1307 (8th Cir. 1993).

## FACTUAL BACKGROUND

Aurora Co-op is a Nebraska corporation located in Aurora, Nebraska. Filing 29-1 at ¶ 2.[1] Aventine West, a Delaware LLC, is the wholly owned subsidiary of its sole member, Aventine Holdings, a Delaware corporation with its principal place of business in Texas. Filing 13 at ¶¶ 2–3; filing 29-1 at ¶¶ 5, 19. In April 2006, Aurora Co-op and Aventine Holdings entered into a letter of intent for the sale and development of two lots of real property located west of Aurora (the "Aurora West site"). Filing 29-1 at ¶ 4; filing 29-2. The letter of intent provided for the development of an ethanol plant on the site by Aventine Holdings, and construction of related infrastructure by Aurora Co-op. Filing 29-1 at ¶ 4. Aurora Co-op then sold the property to Aventine Holdings, as set forth in a Purchase Agreement executed in June 2006. Filing 13-1; filing 29-1 at ¶ 8. As part of the Purchase Agreement, Aventine Holdings granted Aurora Co-op an option to repurchase the Aurora West site if Aventine abandoned development of the plant or failed to pay performance penalties for not meeting development deadlines. Filing 13-1 at 10. That way, the Co-op could sell the site to a company that would actually develop and operate an ethanol plant on the site. Filing 29-1 at ¶ 10.

On August 1, 2006, Aurora Co-op, Aventine Holdings, and Aventine's subsidiary, Nebraska Energy LLC ("NELLC"), entered into a "Master Development Agreement" (the "MDA"). Filing 29-1 at ¶ 11; filing 13-3. The

---

[1] Unless otherwise indicated, citations to the record refer to the case filed by Aurora Co-op, no. 4:12cv230.

MDA set forth the parties' rights and obligations in connection with the construction and operation, by Aventine, of a new ethanol plant located on the Aurora West site. Filing 29-1 at ¶ 12. The MDA provided that it was to be governed by the laws of Nebraska. Filing 13-3 at 29.

Under the MDA, Aventine Holdings agreed to "diligently pursue to completion all action which may be necessary or appropriate to site, design, construct and equip" the plant (with exceptions for some infrastructure projects that Aurora Co-op would undertake). Filing 13-3 at 4–5. The MDA also set forth deadlines and performance requirements for the new plant.

Section 2.2 of the MDA provided, in relevant part, that "Aventine shall use its commercially reasonable best efforts to obtain a permit for a 220 million gallon per year ("MGPY") facility" and that "the capacity of the Aventine Ethanol Plant as initially permitted shall in no event be less than 110 MGPY." Filing 13-3 at 4. Section 2.3 required Aventine to "have received all permits necessary to construct the Aventine Ethanol Plant with a capacity of not less than 110 MGPY, and commenced construction on the initially permitted ethanol plant on or before November 1, 2007." Filing 13-3 at 4. The plant, as initially permitted, and all infrastructure, was to have been "**complete and ready for startup and operation** no later than July 1, 2009." Filing 13-3 at 4 (emphasis supplied). Section 10.2 provided, with slightly different phrasing, that by July 1, 2009, the plant was to be "**completed and fully operational** for the production of a minimum of 110 MGPY of [e]thanol[.]" Filing 13-3 at 13 (emphasis supplied). Aventine agreed to pay monthly penalties if it failed to meet this deadline. Filing 13-3 at 13–14.

The MDA envisioned that Aventine Holdings would eventually operate the plant, and that this would form the basis of an ongoing commercial relationship between the parties. Filing 13-3 at 1–4; filing 29-1 at ¶¶ 6–7. Aurora Co-op had hoped to gain a long-term, reliable buyer of grain produced by its farmer-members. Filing 29-1 at ¶¶ 6–7. Accordingly, the MDA also required Aventine Holdings and Aurora Co-op to execute and perform certain other contracts, including the "Grain Supply Agreement" and the "Aventine Marketing Agreement." Filing 29-1 at ¶¶ 13–15. In the Grain Supply Agreement (executed in August 2006), Aventine Holdings represented to Aurora Co-op that it "intends to construct, operate and maintain a new ethanol production facility located on the Aurora West Industrial Site" and that "once the Aventine Ethanol Plant is complete and operational, Aventine will require a continuous uninterrupted supply of yellow corn . . . ." Filing 29-1 at ¶ 13; filing 29-3 at 1. And Aventine Holdings agreed to purchase from Aurora Co-op "on an exclusive basis, all of the [g]rain which Aventine requires to operate the Aventine Ethanol Plant." Filing 29-3 at 2.

On the same day, Aventine Holdings and Aurora Co-op also executed the Aventine Marketing Agreement. Filing 29-1 at ¶ 15. Aventine Holdings represented that it was currently in the process of developing and, following completion, would own and operate an ethanol plant located approximately 1 mile west of Aurora, Nebraska. Filing 29-4 at 1. Aventine Holdings also represented that the plant would produce certain ethanol byproducts, and agreed that Aurora Co-op would market and sell these byproducts on an exclusive basis, within 250 miles of Aurora, for a marketing fee. Filing 29-4 at 1–4.

On August 13, 2007, Aventine Holdings assigned all of its rights under the MDA to Aventine West, pursuant to an "Assignment and Assumption Agreement."[2] Filing 13 at ¶ 18; filing 13-4. The agreement provided that Aventine Holdings and Aventine West were jointly and severally liable for all obligations to Aurora Co-op under the MDA. Filing 13-4 at 1.

Construction of the new plant did not proceed as Aurora Co-op had hoped, or as Aventine had promised. In October 2008, Aventine Holdings issued a press release announcing that Aventine West and its general contractor had agreed to extend the construction schedule. Filing 29-6. Aventine was focusing its efforts on another ethanol facility it was constructing in Indiana. Filing 29-6. Then in November 2008, Aventine Holdings issued another press release, announcing that it was temporarily suspending construction of the plant for approximately 6 months, due to "disappointing economics surrounding the production of ethanol . . . ." Case no. 8:12cv386, filing 25 at 78. In April 2009, the Aventine parties filed for bankruptcy. Filing 29-1 at ¶ 23. Construction of the plant ceased. Filing 13 at ¶ 19. The July 1, 2009, deadline for completion of the plant came and went, and penalties began to accrue under the MDA. Filing 29-1 at ¶¶ 23–24. When Aventine emerged from bankruptcy in March 2010, it owed Aurora Co-op more than $2 million in penalties. Filing 29-1 at ¶¶ 23–24.

On March 23, 2010, in order to address the unpaid performance penalties and other issues, the Aventine parties, NELLC, and Aurora Co-op entered into the "2010 Agreement," which modified portions of the MDA, Grain Supply Agreement, and the original real estate option. Filing 29-1 at ¶ 25; filing 13-5. Like the MDA, the 2010 Agreement provided that it was to be governed by the laws of Nebraska. Filing 13-5 at 6.

Under § 6 of the 2010 Agreement, the parties amended the option contained in the purchase agreement in its entirety (the "Amended Option"). Filing 13-5 at 4. The Amended Option granted Aurora Co-op the right to

---

[2] Later, in December 2010, Aventine Holdings conveyed the property to Aventine West. Filing 13 at ¶ 24; filing 13-7.

repurchase the site for $16,500 per acre (the purchase price), subject to certain offsets, in the event Aventine failed to recommence construction of the plant on or before January 1, 2012, or failed to "diligently pursue construction of the Aurora West Facility to completion on or before July 1, 2012 . . . ." Filing 13-5 at 4.

Section 7 of the 2010 Agreement further provided that the Amended Option

> shall terminate when the Aurora West Facility is completed and fully operational for the production of a minimum of 90,000,000 gallons of ethanol per year for a period of thirty (30) consecutive business days; or, if not previously terminated, on the later of (i) July 31, 2012, or (ii) thirty (30) days after any stay of Aurora Coop's right to exercise the Amended Option has expired.

Filing 13-5 at 5.

Aurora Co-op asserts that, while it has carried out its obligations under the parties' various agreements, Aventine has not held up its end of the bargain. The Co-op alleges that Aventine failed to diligently pursue construction of the plant to completion by July 1, 2012. Filing 13 at ¶ 26. George Hohwieler, the president and CEO of Aurora Co-op, averred that the Aventine parties delayed construction of the plant, and instead focused their efforts on the Mt. Vernon, Indiana plant. Filing 29-1 at ¶¶ 28–29; filing 29-13 at ¶¶ 12–15. And Robert Brown, the chief financial officer of the Co-op, averred that at some time on or before September 2011, Aventine removed equipment from the plant in order to use it at the Indiana plant. Filing 29-13 at ¶¶ 12–13. Leading up to April 2012, Hohwieler, Brown, and other Co-op employees "observed an apparent lack of construction activity at the Plant." Filing 29-1 at ¶ 29; filing 29-13 at ¶ 14. By April 2012, however, the removed equipment had mostly been replaced. Filing 29-13 at ¶ 15. Hohwieler also averred that, as late as August 2012, he witnessed unspecified construction activity at the plant. Filing 29-1 at ¶ 34.

Aurora Co-op also alleges that Aventine has failed to produce ethanol at the plant "in accordance with the performance criteria set forth in the MDA." Filing 13 at ¶ 27. It is not disputed that Aventine has, at least briefly, operated the plant. John W. Castle, the CEO of Aventine Holdings, averred that on June 26, 2012, Aventine operated the plant for about 50 hours in order to demonstrate that the plant was complete and ready for startup. Filing 29-12 at ¶ 10. Castle stated that the plant processed 80,000 bushels of corn and distilled the resulting ethanol by June 29, 2012. Filing 29-12 at ¶ 10.

However, Hohwieler averred that, according to Aventine representatives, the plant would consume 100,000 bushels of corn per day when complete and fully operational. Filing 29-1 at ¶ 31. And to date, the 80,000 bushels is the only grain Aventine has purchased for the plant—less than 1 day's worth for a fully operational plant. Filing 29-1 at ¶ 32. So, Aventine has never demonstrated that the plant was fully operational for the production of 110 million gallons of ethanol per year. Filing 29-1 at ¶ 33. Aurora Co-op cites this as further evidence that the plant was not actually complete by July 1, 2012.

The Co-op also points to statements made by the plant's on-site manager, which appeared in an Aurora newspaper on October 3, 2012. Filing 36 at 5–6. The manager stated that, compared to the smaller NELLC plant, the larger Aurora West plant

> is more of an unknown. There is a lot of equipment out here that sat for a very long period of time. It started up really well in June and ran much better than any of us predicted. It only ran a couple of days, which is not enough time to be confident that we know what the equipment is going to do.[3]

Filing 36 at 6.

On July 2, 2012, Aurora Co-op gave Aventine written notice that it was exercising the Amended Option. Filing 29-1 at ¶ 35; filing 13-8. Pursuant to the terms of the Amended Option, Aurora Co-op requested that Aventine attend a closing to be held within 30 days, where the Co-op would make the initial payment. Filing 13 at ¶ 30; filing 13-8; filing 13-5 at 4–5. Aventine has so far refused to comply. Filing 29-1 at ¶ 36.

Aurora Co-op alleges that the Aventine parties have repudiated the Amended Option and that it is ready, willing, and able to perform its obligations. Filing 13 at ¶ 32. It asks the Court to enter judgment requiring Aventine to convey the Aurora West Facility to Aurora Co-op under the terms

---

[3] Aventine has pointed out that the article containing this statement is hearsay, but specifically noted it was not objecting to admission of the article on hearsay grounds, as the article does not affect the outcome of the pending motions. Filing 41. The Court has included the statement of the on-site manager for context; Aventine is correct that it does not affect the outcome of the pending motions. And under Rule 56(c)(2), a party offering evidence need only show that it can be presented in a form that would be admissible in evidence. *See also* Rule 56 advisory committee's note. There is no reason to believe Aurora Co-op could not present the same evidence by deposing the on-site manager.

of the Amended Option, and to enjoin Aventine from conveying the property to anyone else or otherwise encumbering it.

## ANALYSIS

This case comes down to a dispute over one clause contained in the Amended Option. Specifically, the option granted Aurora Co-op the right to repurchase if Aventine failed to "diligently pursue construction of the Aurora West Facility to completion on or before July 1, 2012 . . . ." Filing 13-5 at 4. Aurora Co-op has asserted two separate grounds for exercising the option, which the Court will refer to as the Co-op's "construction" and "production" arguments.

The construction argument is straightforward: Aurora Co-op contends that construction of the plant was not complete by July 1, 2012. Assuming that construction was, in fact, not complete, and that this was the result of less-than-diligent efforts on Aventine's part, the Co-op would have a legitimate basis for exercising the option. At this point, the record does not reveal whether construction was complete. The fact that the plant has never been run at full capacity (or at any capacity for an extended period) suggests that it was not complete. But it is too early to say. Further discovery will no doubt reveal whether the plant was, in fact, complete by July 1, 2012. As to this portion of Aurora Co-op's claim, Aventine's motion for summary judgment must be denied.

Aurora Co-op's production argument is a bit more complex. The Co-op argues that in addition to completing construction by July 1, 2012, the Amended Option required Aventine to run the plant for some period of time in order to demonstrate that the plant was capable of producing 110 million gallons of ethanol per year. Before turning to the merits of this argument, the Court must address a procedural matter. There are currently two separate cases pending before the Court, but only one is needed to resolve all of the parties' claims. As the Court explains next, the declaratory action filed by Aventine will be dismissed.

### I. Aventine's Declaratory Action

The case filed by Aventine only addresses the production basis for exercising the Amended Option. Aventine seeks a declaration that it was not required to produce ethanol, in any quantity (or operate the plant) in order to avoid triggering the option. Case no. 8:12cv386, filing 10 at 4, 16. This issue can readily be resolved in the case filed by Aurora Co-op. But the case filed by Aventine would not resolve the other key matter in dispute: whether Aventine diligently pursued construction to completion. In short, Aventine's

declaratory action serves no useful purpose, and the Court will grant Aurora Co-op's motion to dismiss.

The Federal Declaratory Judgment Act provides that

> [i]n a case of actual controversy within its jurisdiction, except with respect to [certain enumerated actions], any court of the United States, upon the filing of an appropriate pleading, <u>may</u> declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a) (emphasis supplied). As the language of the statute suggests, whether to grant declaratory relief is discretionary. *Medical Assur. Co., Inc. v. Hellman*, 610 F.3d 371, 379 (7th Cir. 2010); *Aetna Cas. and Sur. Co. v. Jefferson Trust and Sav. Bank of Peoria*, 993 F.2d 1364, 1366 (8th Cir. 1993).

In *Wilton v. Seven Falls Co.,* 515 U.S. 277, 282–90 (1995), the Supreme Court held that federal district courts have broad discretion in determining whether to exercise jurisdiction in a declaratory judgment action when parallel proceedings are pending in *state* court. "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton,* 515 U.S. at 288. A suit is parallel if substantially the same parties are litigating substantially the same issues in different forums. *Scottsdale Ins. Co. v. Detco Industries, Inc.*, 426 F.3d 994, 997 (8th Cir. 2005). The present cases are parallel: both seek to determine the rights and obligations of the parties under the Amended Option.

The *Wilton* Court expressly limited its holding to cases in which parallel proceedings were pending in state court. *Wilton,* 515 U.S. at 290. When there is not a parallel state action pending, the Eighth Circuit has held that the broad discretion allowed under *Wilton* should be tempered by a six-factor test. *Detco,* 426 F.3d at 998. Without a parallel state action, the interests of practicality and judicial administration are less pressing, and courts should not decline jurisdiction as readily. *Id.* at 999. And without a second case, it becomes less likely that all of the parties' claims will be satisfactorily adjudicated. *Id.*

Here, by contrast, there is a parallel case where all the parties' claims can be resolved. The only difference is that the case is pending in federal, rather than state court. The Court therefore finds that the full discretionary

standard set forth in *Wilton* is appropriate. But the Court would reach the same decision after applying the factors set forth in *Detco*.

The factors to consider under *Detco* are: (1) whether the declaratory judgment sought will serve a useful purpose in clarifying and settling the legal relations in issue; (2) whether the declaratory judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the other proceeding; (3) the strength of the state's interest in having the issues raised in the federal declaratory judgment action decided in the state courts; (4) whether the issues raised in the federal action can more efficiently be resolved in the court in which the state action is pending; (5) whether permitting the federal action to go forward would result in unnecessary entanglement between the federal and state court systems, because of the presence of overlapping issues of fact or law; and (6) whether the declaratory judgment action is being used merely as a device for procedural fencing—that is, to provide another forum in a race for res judicata or to achieve a federal hearing in a case otherwise not removable. *Id.* at 998.

The first and second factors weigh against hearing Aventine's declaratory action. Aventine only seeks to determine whether the Amended Option can be triggered by a lack of production. The case will not resolve whether the Aventine parties diligently pursued construction to completion. Even if the Court grants the declaratory judgment sought by Aventine Holdings, the Co-op's case will remain pending. In other words, the declaratory action will accomplish little.

Analysis of the remaining factors does not change the result. The third and fifth factors are not implicated here. To the extent the fourth factor is relevant, the Court finds that the issues raised in the declaratory action can be resolved just as efficiently in the case filed by the Co-op. As to the sixth factor, the record suggests that the declaratory action was brought simply to obtain a favorable forum. The only reason for Aventine to bring its case in Texas was because Aventine Holdings is located there. Judge O'Connor found as much in his order transferring Aventine's case to this Court. Case no. 8:12cv386, filing 27. Having considered the *Detco* factors, the Court finds that Aventine's declaratory action should be dismissed. The purpose of the Declaratory Judgment Act is to facilitate efficient outcomes. *Hellman,* 610 F.3d at 381. Here, that purpose is best served by deciding all the issues presented in the case filed by Aurora Co-op.

The "first-filed rule" does not mandate a different result. As a general rule, when there are two competing lawsuits, the first court in which jurisdiction attaches has priority to consider the case. *Nw. Airlines, Inc. v. Am. Airlines, Inc.,* 989 F.2d 1002, 1005 (8th Cir. 1993). But the first-filed rule is not rigid or mechanical; and it should be applied in a manner that best

serves the interest of justice. *Id.* And the first-filed rule "much more often than not gives way in the context of a coercive action filed subsequent to a declaratory action." *AmSouth Bank v. Dale,* 386 F.3d 763, 791 n.8 (6th Cir. 2004) (collecting cases). For the reasons discussed above, the Court finds that the interests of justice are best served by considering all of the issues presented in the case filed by Aurora Co-op.

Finally, Aventine argues that because Judge O'Connor previously denied Aurora Co-op's motion to dismiss on similar grounds, that ruling is now the law of the case and may not be disturbed. The law of the case doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *First Union Nat. Bank v. Pictet Overseas Trust Corp., Ltd.,* 477 F.3d 616, 620 (8th Cir. 2007). By preventing the relitigation of issues already settled in a case, the doctrine protects the settled expectations of parties, ensures uniformity of decisions, and promotes judicial efficiency. *Id.* But the doctrine applies only to final judgments, not interlocutory orders: district courts have the inherent power to reconsider and modify interlocutory orders at any time prior to the entry of judgment. *Id.* Judge O'Connor's denial of the Co-op's previous motion to dismiss was an interlocutory order, and the doctrine does not apply. *See Bradford v. Huckabee,* 330 F.3d 1038, 1040 n.3 (8th Cir. 2003). Nor does it matter that a case has been reassigned from one judge to another. *Rimbert v. Eli Lilly and Co.,* 647 F.3d 1247, 1252 (10th Cir. 2011).

Although the law of the case doctrine does not apply, the Court is mindful of the policies underlying the doctrine. As a practical matter, the Court will generally not revisit its own rulings, or those of a transferring judge. But considering the Co-op's new motion to dismiss will not offend the interests protected by the law of the case doctrine.

First, it is doubtful that when Judge O'Connor summarily denied the Co-op's motion to dismiss he intended the dismissal to prevent this Court from considering whether to exercise its discretion under the Federal Declaratory Judgment Act. Judge O'Connor's order was first and foremost concerned with placing this case in the proper venue; after deciding to transfer the case to this Court, the Co-op's motion to dismiss was summarily denied. Filing 27 at 6. And while Judge O'Connor briefly considered and rejected the other argument underlying the Co-op's motion to dismiss—that Aventine lacked standing because Aventine West was not a party—his opinion contains no discussion of dismissing the declaratory action as a discretionary matter. *See* filing 27 at 4 n.1.

Second, even if Judge O'Connor had implicitly decided that this Court should exercise its discretion to hear the declaratory action—a doubtful

proposition—that decision is not binding in light of the changed circumstances confronting this Court. Both Aventine's declaratory action and the Co-op's case are before this Court. Judge O'Connor was working with only Aventine's case; the option of resolving all the issues in the Co-op's case was not available to him. But that option is available now, and the Court finds it to be the better choice. Accordingly, the Court will grant Aurora Co-op's motion to dismiss (case no. 8:12cv386, filing 54), deny as moot Aventine's motion for summary judgment (filing 9), and deny as moot the Co-op's motion to supplement the record (filing 56).

## II. Aurora Co-op's Asserted "Production" Requirement

As discussed above, Aurora Co-op argues that to avoid triggering the Amended Option, Aventine had to run the plant for some period of time in order to demonstrate that the plant was capable of producing 110 million gallons of ethanol per year. Unfortunately for Aurora Co-op, there is no basis for such a requirement in the Amended Option. Aventine, in contrast, argues that to avoid the Amended Option, it only had to complete construction of the plant, and that although the plant had to be *capable* of producing ethanol, Aventine was not required to actually produce any. The Court finds that this is the correct interpretation of the Amended Option, at least at this preliminary stage.

The 2010 Agreement, which contained the Amended Option, does not itself describe when construction of the plant was to be considered "complete." But the 2010 Agreement was part of a related series of contracts, including the MDA and the Purchase Agreement, and instruments made in reference to and as part of a transaction are to be considered and construed together. *Norwest Corp. v. State, Dept. of Ins.*, 571 N.W.2d 628, 634 (Neb. 1997). If the instruments are related to and were part of the same transaction, it is not important that they were made or dated at different times. *Id.* All of these agreements were part of one transaction: the development and operation of the plant. And the 2010 Agreement amended (but did not replace) both the MDA and Purchase Agreement. So, the Court considers and construes the Amended Option together with the parties' other agreements.

The MDA described when the plant was complete. By July 1, 2009, the plant was to be "complete and ready for startup and operation" at a capacity of 110 million gallons of ethanol per year, with all appropriate permits. Filing 13-3 at 4. And in another section, the MDA required the plant to be "completed and fully operational for the production of a minimum of 110 MGPY of [e]thanol[.]" Filing 13-3 at 13 (emphasis supplied). Not surprisingly, in order to be complete, the plant had to be capable of producing ethanol in the requisite quantities.

The parties also envisioned that Aventine would actually produce ethanol at the plant. For example, in the Grain Supply Agreement, Aventine represented that it intended to construct and operate a new ethanol plant, and promised to buy all the grain it needed from Aurora Co-op. Filing 29-3 at 1–2. But whether the MDA or any of the parties' other agreements required Aventine to produce ethanol is not before the Court at this time. The only question is whether the Amended Option contained such a requirement.

When given its plain reading, the Amended Option contains no such requirement. The option was triggered only if Aventine failed to recommence construction of the plant on or before January 1, 2012, or failed to "diligently pursue construction of the Aurora West Facility to completion on or before July 1, 2012 . . . ." Filing 13-5 at 4. Aventine only needed to complete *construction* of the plant in order to avoid the option. And to be complete, the plant only had to be capable of producing 110 million gallons of ethanol per year, as well "ready for startup" and "fully operational." But the Amended Option contained no requirement that Aventine run the plant to demonstrate to Aurora Co-op that the plant was complete. Such a requirement would have made sense, but the Court cannot re-write the parties' contract.

Aurora Co-op claims that a separate section of the 2010 Agreement supports its reading of the Amended Option. Section 7 provided that the option would terminate early if the plant was "fully operational for the production of a minimum of 90,000,000 gallons of ethanol per year for a period of thirty (30) consecutive business days[.]" Filing 13-5 at 5. If a production requirement is not read into the Amended Option, Aurora Co-op argues, then under § 7 Aventine can avoid the option simply by "unilaterally asserting that the Plant is" complete. Filing 28 at 32. And if Aventine could get away with that, there is no reason it would ever choose the more arduous option of running the plant at 90-million-gallon capacity for 30 days.

But § 7 supports Aventine's interpretation, not the other way around. In drafting § 7, the parties showed that they knew how to draft a production requirement. Therefore, the absence of such a requirement in the Amended Option (which immediately precedes § 7) is significant. And contrary to Aurora Co-op's argument, Aventine cannot avoid the option simply by asserting that the plant is complete. Either the plant was complete by July 1, 2012—that is, capable of producing 110 million gallons of ethanol per year—or it was not. Aventine can assert whatever it wants, but if that assertion does not match the evidence, Aventine will have breached the parties' agreement.

More broadly, Aurora Co-op argues that the burden was on Aventine to demonstrate that the plant was complete, i.e., ready for startup and fully operational for the production of 110 million gallons of ethanol per year.

Aventine counters that, even if it bore the burden of demonstrating the plant was complete, running the plant at the required capacity for some period of time was not the only way it could have made the demonstration. Instead, Aventine claims, it could have had an expert inspect and certify the plant. But that is beside the point, because Aventine has not presented any evidence that it did such an inspection, or was ready, willing, and able to do so. Nor, as Aventine argues, is the fact that it ran the plant at a lesser capacity for 3 days proof that the plant was capable of operating at the required capacity for an extended period.

    Both sides raise valid points. In a sense, the burden of demonstration had to be on Aventine. The plant belonged to Aventine and was supposed to stay that way. If Aventine had constructed the plant in order to sell it to Aurora Co-op, it would perhaps have made sense for Aventine, as seller and builder, to insist that Aurora Co-op, as the purchaser and ultimate operator, to undertake the procedures necessary to satisfy itself that the plant was up to its specifications. But here, the plant belonged to Aventine. Aventine might have agreed to an inspection by the Co-op, but it is not likely that Aventine would have allowed the Co-op to bring in several thousand bushels of grain to run the plant to its satisfaction.

    On the other hand, the plant was either complete or not, regardless of whether Aventine provided a demonstration. Although an ethanol plant is a complex operation with many moving parts, it does not exist in a quantum state where it is simultaneously incomplete and at full operational capacity. The question is, assuming that the plant was complete by July 1, 2012, was Aventine obliged to do anything more to avoid the Amended Option? Refusing to run the plant (or delaying its startup) might have been a breach of the parties' other agreements. But at this stage, the Court is not convinced that, assuming the plant was ready for startup and fully operational, the option was nonetheless triggered simply because Aventine did not provide a satisfactory demonstration. Aurora Co-op has cited no basis in the parties' agreements for placing a burden of demonstration on Aventine. Nor has the Co-op pointed to any such basis in the law of contracts. The law might very well support Aurora Co-op's position, but the Co-op has yet to brief the issue.

    Finally, Aurora Co-op cites various statements made by Aventine in press releases and filings with the Securities and Exchange Commission, as well as Aventine's course of performance, as evidence that Aventine also understood the Amended Option to contain a production requirement. The Court has reviewed this evidence and does not find it convincing. More to the point, the language of the option is clear, and the Court does not need other evidence as an aid to interpretation.

In sum, the Court finds—at this stage—that the Amended Option did not contain a production requirement. But the Court will not enter partial summary judgment on this issue in favor of Aventine. This case is in its early stages, and the Co-op may be able to come forward with additional arguments or evidence that show the Amended Option should be read to include a production requirement. It may also be that the Co-op is correct that Aventine bore the burden of demonstrating the plant was complete. In that case, there may be a de facto production requirement in the Amended Option. Thus, Aventine's motion to dismiss, construed as a motion for summary judgment, will be denied in its entirety.

### III. Aventine's Motion to Dismiss for Failure to State a Claim

Aventine next argues that the Co-op's complaint fails to state a plausible claim for relief. As set forth in its amended complaint, Aurora Co-op's case rests on two succinctly stated allegations: that Aventine failed to diligently pursue construction of the plant to completion by July 1, 2012; and that Aventine failed to produce ethanol at the plant "in accordance with the performance criteria set forth in the MDA." Filing 13 at ¶¶ 26–27. As discussed above, at this point the Court is not convinced that the Amended Option was triggered by a lack of production. But the Court need not dwell further on that point, because the allegation that Aventine failed to diligently pursue construction is sufficient to state a claim. Aventine does not dispute that such a failure would have triggered the Amended Option. Instead, Aventine contends that the Co-op has not alleged sufficient facts to support its claim that construction was not complete.

Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the court to draw on its judicial experience and common sense. *Iqbal*, 556 U.S. at 679. The purpose of notice pleading under Rule 8 is to give the opposing party fair notice of what the claim is and of the grounds upon which it rests. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009); *see also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1215 (West 2012). The Co-op's amended complaint satisfies this standard. It provided Aventine with sufficient notice of the Co-op's claim and the grounds upon which it rests. The MDA, which was attached to the complaint, sets forth the essential requirements for a complete plant. This includes, most importantly, that the plant was capable of producing 110 million gallons of ethanol per year. That is precisely what the Co-op alleged the plant was not capable of doing.

Finally, Aventine argues that the Co-op should be estopped from arguing that failure to complete construction provides an independent ground for relief. The Co-op's original complaint did not contain an allegation that

Aventine failed to diligently pursue construction to completion, and instead rested entirely on the Co-op's "production" theory. *See* filing 1-1. When the Co-op requested additional time to amend its complaint, it claimed that the new complaint would not "significantly change the issues in this action." Filing 22 at 2. So, Aventine argues, having admitted that the new construction allegation is not "significant," the Co-op should be "estopped from relying on that allegation as the sole basis to support the sufficiency of the amended complaint if the other allegations do not state a cause of action." Filing 26 at 29.

This argument, while creative, is without merit. The construction allegation is indeed significant: it tracks the terms of the Amended Option. That said, the new allegation did not change the nature of this dispute. Aventine knew that the Co-op wanted, at the bare minimum, a plant that was fully constructed by July 1, 2012. The Co-op's amended complaint simply clarifies the grounds on which it seeks to enforce the Amended Option. In sum, the Co-op's amended complaint states a claim for relief, and the Court finds that Aventine's motion to dismiss (filing 25) should be denied.

## CONCLUSION

After simplifying some procedural matters, the present dispute emerges as (what appears to be) a relatively straightforward question of fact: was the plant complete by July 1, 2012? Aventine's declaratory action would not have addressed this issue, and will be dismissed. The parties' dispute can be more efficiently addressed in the case filed by Aurora Co-op, and that case may now proceed.

THERFORE, IT IS ORDERED:

1. In case no. 8:12cv386:

    a. Aurora Co-op's motion to dismiss (filing 54) is granted;

    b. Aventine Holdings' motion for summary judgment (filing 9) is denied as moot;

    c. Aurora Co-op's motion to supplement the record (filing 56) is denied as moot; and

    d. The case is dismissed, and a separate judgment will be entered.

2. In case no. 4:12cv230:

   a. The Aventine parties' motion to dismiss (also construed as a motion for summary judgment) (filing 25) is denied; and

   b. Aurora Co-op's motion to supplement the record (filing 34) is granted.

Dated this 12th day of March, 2013.

BY THE COURT:

*John M. Gerrard*

John M. Gerrard
United States District Judge